

**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

WWW.ED.GOV

400 MARYLAND AVENUE, SW
WASHINGTON, D.C. 20202-1100

March 19, 2025

Pender Makin, Commissioner
Maine Department of Education
23 State House Station
Augusta, ME  04333-0023
***Sent via email:*** commish.doe@maine.gov

    Re:    Directed Investigation No. 01255902
                Maine Department of Education
                Letter of Finding of Noncompliance

Dear Commissioner Makin:

This letter is to inform you of the outcome of the directed investigation of the U.S. Department of Education's Office for Civil Rights (OCR) into the Maine Department of Education (MDOE), which OCR initiated on February 21, 2025 (Investigation).

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq*., and its implementing regulation at 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. As a recipient of federal financial assistance from the U.S. Department of Education (Department), MDOE is subject to these laws and regulations. Additional information about the laws OCR enforces is available on our website.

The Investigation examined whether MDOE is in continuing violation of Title IX by permitting, directing, instructing, or requiring Maine school districts to: (1) allow males to participate in female athletics (whether interscholastic, intercollegiate, club or intramural); and (2) deny to female students (particularly, female student-athletes) access to intimate facilities on the basis of sex, such as female-only locker rooms and bathrooms.

In accordance with OCR's Case Processing Manual (CPM) (February 19, 2025), OCR has reached the determinations set forth in this letter by using a preponderance of the evidence standard as to whether there is insufficient evidence to support a conclusion of noncompliance, or evidence supporting a conclusion of noncompliance.

Based on the evidence obtained, OCR has determined the evidence supports a conclusion of noncompliance with Title IX by MDOE. OCR notes that public school districts throughout the State of Maine that receive federal financial assistance and have policies or practices that allow boys to participate in girls' athletics programs and/or deny female students access to female-only intimate facilities, are similarly in violation of Title IX. Should MDOE fail to direct the public school districts in its jurisdiction to adopt and implement policies and practices that comply with Title IX, OCR may initiate additional investigations into such school districts.

OCR's findings and conclusions are discussed below.

**Legal Standards**

      A.      **Title IX and its [implementing regulation](#)**[1]

Title IX of the Education Amendments of 1972 (Title IX) states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance," with certain exceptions. 20 U.S.C. § 1681(a), *see also* 34 C.F.R. 106.1.

The Title IX implementing regulation, at 34 C.F.R. § 106.31(a), states in relevant part:

> Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives federal financial assistance.

The Title IX implementing regulation, at 34 C.F.R. § 106.31(b), states in relevant part:

> Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex: (1) Treat one person differently from another in determining whether such person satisfies any requirements or condition for the provision of such aid, benefit or service: (2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; Deny any person any such aid, benefit, or service; (4) Subject any person to separate or different rules of behavior, sanctions, or other treatment; . . .(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees; [or] Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

The Title IX implementing regulation, at 34 C.F.R. § 106.31(d), states in relevant part:

> 1. [I]n any education program or activity not operated wholly by such recipient, or which facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient . . .(2) Such recipient: (i) Shall develop and implement a procedure designed to assure itself that the operator or sponsor of such other education program or activity takes no action affecting any . . . student…of such recipient which this part would prohibit such recipient from taking; and (ii) Shall not facilitate, require, permit, or consider such participation if such action occurs.

The Title IX implementing regulation, at 34 C.F.R. § 106.33, states:

> A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

---

[1] This letter cites to the Title IX regulations that are currently in force and that took effect August 14, 2020. *See Tennessee v. Cardona*, No. 24-0072-DCR, 2025 WL 63795, at *6 (E.D. Ky. Jan. 9, 2025).

The Title IX implementing regulation, at 34 C.F.R. § 106.41(a), provides as follows:

> a. *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a Recipient, and no Recipient shall provide any such athletics separately on such basis.
> b. *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a Recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a Recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.
> c. *Equal opportunity.* A Recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.
> Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a Recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

B.   **State Law**

The Maine Human Rights Act, 5 Maine Revised Statutes (M.R.S.) § 4551, *et seq*. (Maine HRA) incorporates prohibitions against discrimination based on sex, sexual orientation and "gender identity." 5 M.R.S. § 4553(10)(F) defines "Unlawful discrimination" to include "Unlawful educational discrimination as defined and limited by subchapter 5-B." Subchapter 5-B of the Maine HRA, applies to Educational Opportunity. *See* 5 M.R.S. §§ 4601 and 4602.

The "Right to freedom from discrimination in education," found at 5 M.R.S. § 4601 states in relevant part: "The opportunity for an individual at an educational institution to participate in all educational, . . . and all extracurricular activities without discrimination because of sex, sexual orientation or gender identity, . . . is recognized and declared to be a civil right."

Unlawful educational discrimination is defined under Maine State law, at 5 M.R.S. § 4602, which states, in relevant part:

> 1. It is unlawful educational discrimination in violation of this Act, on the basis of sex, sexual orientation or gender identity, . . . to:
>    A. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, . . . or other program or activity;
>    B. Deny a person equal opportunity in athletic programs;
>    C. Apply any rule . . . to exclude any person from any program or activity . . . because of sex or sexual orientation or gender identity;
>    D. Deny a person admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or
>    E. Deny a person financial assistance availability and opportunity.

MDOE and the Maine Human Rights Commission have enacted a Joint Rule, addressing Equal Educational Opportunity (94-348 and 05-071) ([Joint Rule](Joint Rule)). The Joint Rule includes definitions and specific provisions relating to athletics:

> 4.02   DEFINITIONS
> (C)   Unlawful educational discrimination: "Unlawful educational discrimination" shall mean action on the basis of sex to:
>    1. Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic extracurricular. . . or other program or activity;
>    2. Deny a person equal opportunity in athletic programs;
>    3. Apply any rule concerning the actual or potential family or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions;
>    4. Deny admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or
>    5. Deny financial assistance availability and opportunity.
>
> 4.11   ATHLETICS
> (A)   General
>    No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by an educational institution.
> (B)   Equal Opportunity
>    An educational institution which sponsors or participates in interscholastic, intercollegiate, club or intramural athletics shall provide an overall equal athletic opportunity for both sexes.
>    To provide equal opportunity in these programs, an institution must select sports and levels of competition which effectively accommodate the interests and abilities of both sexes and provide equal opportunities on a seasonal basis.

> This section does not require all teams to be integrated or the provision of identical sports for both sexes.
>
> In determining whether equal opportunities are available in athletics programs, the Commission shall consider whether the following are substantially equal:
> * The provision of equipment and supplies;
> * Scheduling of games and practice time;
> * Travel and per diem allowance;
> * Opportunity to receive coaching and academic tutoring;
> * Assignment of coaches, tutors and officials;
> * Provision of locker rooms, practice and competitive facilities;
> * Provision of medical and training machine facilities and services;
> * Provision of housing and dining facilities and services; and
> * Provision of supportive services and benefits, including publicity, band and cheerleading support sponsored by the educational institution.
>
> Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if an educational institution operates or sponsors separate teams will not constitute per se noncompliance with this section, but the Commission may consider the failure to provide necessary funds for teams of one sex in assessing general equality of opportunity.
>
> (C) Single-Sex Teams
>> An educational institution may sponsor [a] single-sex team in interscholastic or inter-collegiate athletics competitions in the following instances:
>> (1) The institution sponsors a team for each sex in the same sport.
>> (2) The sport is boxing.
>> (3) The educational institution establishes one team in a sport and, as a result of athletic competition for places on the team, or the lack of interest of students, only the members of one sex become members of the team.
>> In such a case, the educational institution must provide equal opportunity in athletics by sponsoring a team in another sport which effectively accommodates the interests and abilities of the opposite sex.
>> (4) The educational institution establishes a single sex team in one or more sports in order to accommodate effectively the interests and abilities of one sex and to increase the general opportunities for participation by that sex.
>> This may be done where competition open to both sexes has or will likely result in an overall lessening of equal opportunities in athletics for one sex.

C. **Potential Conflicts with State Law**

The Title IX implementing regulation, at 34 CFR § 106.6(b), states: "A recipient's obligation to comply with Title IX is not obviated or alleviated by any state or local law."

As discussed *infra*, the Maine HRA and Joint Rule may be interpreted in a manner not in conflict with Title IX. However, to the extent that those State laws/rules do conflict with Title IX such that MDOE or its school districts cannot comply with State and federal law, MDOE must comply with Title IX if it wishes to continue receiving federal funds.

**Findings of Fact**

*MDOE's Assurance re Title IX Compliance*

As a recipient of federal financial assistance through the Department, MDOE has submitted with the Department a signed "Assurance of Compliance – Civil Rights Certificate" (the Assurance), in consideration of and for the purpose of obtaining federal grants and other federal financial assistance from or through the Department. The Assurance was submitted, in part, in accordance with 34 C.F.R. §106.4. The Assurance states that the "applicant or recipient (hereinafter applicant) provides this assurance in consideration of and for the purpose of obtaining Federal grants, loans and contracts…other Federal financial assistance from the United States Department of Education (Department), or funds made available through the Department" and applies to "all…funds made available through the Department, including any that an applicant may seek in the future." The Assurance further states that the recipient "assures that it will comply with…Title IX" and all "regulations, guidelines, and standards lawfully adopted under" Title IX by the Department.

The Assurance further states that the recipient "agrees that compliance with this Assurance constitutes a condition of continued receipt of Federal financial assistance from or funds made available through the Department, and that it is binding upon the applicant…for the period during which the assistance or these funds are provided." The Assurance further states, "The applicant further assures that all contractors, subcontractors, subgrantees, or others with whom it arranges to provide services or benefits are not discriminating in violation of [Title IX]" and "In the event of failure to comply, the applicant understands that this assistance or these funds can be terminated and the applicant denied the right to receive further assistance or funds." Finally, the Assurance concludes, "The applicant also understands that the Department may, at its discretion, seek a court order requiring compliance with the terms of the Assurance or seek other appropriate judicial relief."

*MDOE's Responsibility, Authority, and Policies*

MDOE oversees the State of Maine's educational institutions, which are primarily but not exclusively public schools, whose elementary and secondary districts are called by MDOE "school administrative units (SAUs)" (the presumable equivalent under Department statutes and regulations of Local Education Agencies or LEAs). MDOE is responsible for supervising and guiding all public schools, coordinating a system of public education, and enforcing applicable regulatory requirements and other rules. *See* 20-A M.R.S. §§ 201, 202, 251-A, and 255. As part of these responsibilities, MDOE may direct superintendents and school boards in the discharge of their duties, with written guidance. *See* 20-A M.R.S. § 254(1).

Public schools, in turn, are obligated to follow guidelines from MDOE demonstrating adherence to regulatory requirements and other rules. *See* 20-A M.R.S. § 258-A. MDOE is responsible for determining which schools "are in compliance with basic school approval standards…and the Maine Human Rights Act." 20-A M.R.S. § 4504. To ensure public schools' compliance, MDOE may conduct reviews for which public schools must prepare documentation demonstrating compliance. Public schools must also submit annual reports or "comprehensive education plans"

demonstrating compliance with various statutory and regulatory requirements. *See* 20-A M.R.S. §§ 4502, 4504. This includes "all documentation and data required by [MDOE] to meet state and federal requirements." 05-071-125 Me. Code R. § 4. Public schools that fail to comply are subject to corrective action by MDOE which may result in penalties, including the withholding of State funds and referral to the State Attorney General. 05-071-125 Me. Code R. § 7.03. The authority of MDOE over the activities of public schools in Maine, specifically related to the participation of student athletes in interscholastic competitions, is significant and those schools rely on guidance from MDOE for compliance findings and continued funding.

MDOE has published guidance on its website, described as "best practice approaches" to promote positive school climates on campus and in school programs. Included as a best practice is a statement "students must be permitted to use the bathroom and other sex-separated facilities in accordance with or corresponding most closely to their gender identity... All other school-related rules, programs and activities must ensure that students can comply with a rule, or participate in a program or activity, consistent with their gender identity."

MDOE also published a Maine DOE Priority Notice dated January 21, 2025, stating in part that the Executive Order entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" does not inhibit the force of Maine law and "Maine SAUs are expected to abide by the Maine Human Rights Act (MHRA), which prohibits discrimination on the basis of protected class in…education…. Protected classes include: race, color, ancestry, national origin, sex, sexual orientation (which includes gender identity and expression)…."

School districts in Maine relied and acted on MDOE's published guidance and interpretations of State and federal law. Publicly available information indicates many Maine SAUs have written policies that allow male students to participate in athletic programs designated for girls or women, and that over at least the past two years and continuing in the current school year, at least three male student-athletes have competed in Maine high school girls' athletic programs for at least five different high schools (so affecting many more times that number of high schools whose female athletes competed against the male athletes), including in cross country, track and field, basketball, and skiing.[2]

*Maine Principals' Association*

The Maine Principals' Association (MPA) is responsible for promoting, organizing, and regulating interscholastic activities in the state of Maine and is a member of the National Federation of State High School Associations (NFHS). Neither the MPA[3] nor NFHS impose a policy requiring that single-sex sports teams and competitions be open for participation only to members of the

---

[2] https://www.pressherald.com/2025/03/13/opinion-why-maine-is-wrong-on-the-transgender-athletes-issue/; https://www.outkick.com/sports/transgender-male-high-school-girls-skiing-maine-trump-executive-order/; https://www.thecollegefix.com/male-athlete-pole-vaults-girls-track-team-to-state-championship/; https://me.milesplit.com/articles/355904/greely-edges-freeport-by-1-point-to-win-class-b-girls-title/; https://thepostmillennial.com/trans-identified-male-wins-maine-high-school-pole-vaulting-championship-despite-trump-eo; https://newbostonpost.com/2024/06/02/transgender-maine-girls-track-athlete-wins-state-championship/; https://www.pressherald.com/2016/02/07/becoming-lucy-portland-family-embraces-reality-of-childs-gender-identity/ and https://www.hudl.com/profile/17196526/Lucy-Tidd.

[3] The MPA does not determine whether a student qualifies to participate in a particular sport based on the concept of "gender identity," versus on sex. Under Article II, Section 12 of the MPA's 2024-2025 handbook, public schools in Maine have the sole authority to verify a student's "gender identity" assignment for the purposes of athletic registration and participation in MPA sponsored events.

designated sex. Rather, the MPA and NFHS allow their membership units to determine eligibility for participation on teams and competitions designated for girls/women.

A Maine SAU, therefore, could follow MDOE rules and guidelines without jeopardizing its membership and participation in the MPA. MDOE could direct SAUs to restrict eligibility for girls/women's sports teams and categories to female student-athletes, without resulting in SAUs losing membership or participation in the MPA. Of course, as noted in the Assurance discussed *supra*, neither MDOE nor any other recipient of federal funds is permitted to contract or arrange to provide services or benefits with an entity that discriminates in violation of Title IX. Thus, MDOE's obligation to comply with Title IX (including its authority to direct SAUs to comply with Title IX) includes refusing to contract with, or arrange for services or benefits to be provided by, MPA (and directing SAUs to do the same) if MPA discriminates in violation of Title IX.

## Analysis

The plain language of the Maine HRA and Joint Rule can be interpreted in a way that conforms to the nondiscrimination requirements of Title IX and its implementing regulations. However, MDOE has chosen to interpret those laws (and issue guidance and directives to SAUs) in a way that conflicts with Title IX to the detriment of female student-athletes in violation of Title IX. In so doing, MDOE is also causing SAUs to violate Title IX.

MDOE's interpretation of the Maine HRA and Joint Rule, and school districts' reliance on MDOE's rules and guidance embodying that interpretation, have resulted and continue to result in girls and young women throughout Maine having no school sports teams, events, or categories for which eligibility to join and participate is open only to female students. Rather, Maine female student-athletes train, practice, try out, compete, and strive for success in a school athletics system that refuses to give girls and young women the genuine opportunity to benefit from school sports that Title IX requires.

Such denial of benefits on the basis of sex is not based on the plain language of the applicable federal (or even State law), but on guidance and interpretations provided to SAUs by MDOE exercising its significant influence and authority over the school districts under its jurisdiction. Though MDOE's motivation is not pertinent to the determining its noncompliance, it appears that MDOE is choosing its policies in unwarranted deference to the ideology of "gender identity," proponents of which insist that "nondiscrimination based on gender identity" must equate to treating individuals according to subjective "gender identities" rather than based on sex even in circumstances where sex classifications exist to protect the rights, safety, and equal opportunities of girls and women.

Publicly available information, with no contrary facts presented by MDOE during this Investigation, demonstrates by a preponderance of the evidence that at least three male athletes recently have competed (in multiple sports, in numerous competitions/events) in Maine high school athletics competitions designated for girls/women and used locker rooms or bathrooms designated for girls/women. Title IX simply does not permit the bait-and-switch of promising female student-athletes a girls' competition and a girls' locker room while actually permitting males to participate in the activity or access the space. Moreover, whether or not any male students had actually participated, a policy that *would allow* boys/men to participate in sports programs designated for girls/women facially violates Title IX.

Nothing about the plain language of the Maine HRA or Joint Rule requires Maine school districts to let students choose which sex-separated sports team they want to join or which sex-separated intimate facility they want to access. Consistent with the requirements of both Title IX and the Maine HRA, MDOE guidance could instruct SAUs to provide sex-separated sports and intimate facilities while also prohibiting "discrimination based on gender identity" because all students – regardless of expressing a belief about "gender identity" – would have the opportunity to participate in sports and use facilities, on the basis of the objective characteristic of sex. Avoiding "discrimination based on gender identity" does not inherently require an institution to act as though an individual's "gender identity" beliefs (subjective, mutable feelings) are true or determinative of the individual's sex (an objective, immutable characteristic).

A recipient's obligation to comply with Title IX is not obviated or alleviated by any state or local law. 34 CFR § 106.6(b). Nevertheless, it does not appear that Maine's laws need to be amended in order to bring MDOE into conformity with the requirements of Title IX and its implementing regulation – if MDOE were committed to complying with federal law as MDOE assured the Department it would do as a condition to federal funding.

MDOE, however, has elected to direct and advise SAUs to allow boys and men to participate in sports programs and access intimate facilities designated for girls and women. Accordingly, OCR has determined the evidence supports a conclusion of noncompliance with Title IX.

Based on presumably similar factual findings and legal standards, it is highly likely that numerous school districts under MDOE's jurisdiction are also in continuing violation of Title IX for implementing formal or informal policies or practices that fail to protect their own girls' teams and sports categories as female-only (such as at Portland High School, Maine Coast Waldorf High School, and Greely High School), allow girls on their own girls' teams to compete against girls' teams that have become mixed-sex due to the participation of a male athlete (such as against the foregoing public schools and also private schools like Proctor Academy and North Yarmouth Academy), and fail to provide girls with female-only intimate facilities. The federal funding of SAUs across Maine is thus at risk so long as MDOE remains out of compliance with Title IX.

**Conclusion**

This concludes OCR's investigation. This letter of findings of noncompliance should not be interpreted to address MDOE's compliance with any other statutory or regulatory provision or to address any issues other than those addressed in this letter.

This letter is accompanied by a draft resolution agreement that specifies the actions that, when taken by MDOE, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur. In light of the serious facial and as-applied aspects of MDOE's violations of Title IX, OCR will conclude that attempts to secure MDOE's voluntary compliance are at an impasse unless MDOE executes a resolution agreement <u>within 10 days of the date of this letter</u>.

If no agreement has been executed by that date, OCR will issue to MDOE a letter of impasse that confirms MDOE's refusal to voluntarily come into compliance with Title IX and informs MDOE that OCR will issue a letter of impending enforcement action 10 days following the letter of impasse. Unless MDOE executes a resolution agreement by that time, the letter of impending enforcement action will notify MDOE that OCR is referring its non-compliance determinations to

the U.S. Department of Justice for enforcement including termination of MDOE's funding from the Department.

        Respectfully,

        Bradley R. Burke
        Regional Director

Enclosure: Draft Resolution Agreement