# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE and BROOKE | ) |
| ROLLINS, in Her Official Capacity as, | ) |
| Secretary of Agriculture, | ) |
| | ) |
| Defendants. | ) |

## STATE OF MAINE'S MOTION FOR
## EMERGENCY TEMPORARY RESTRAINING ORDER

Pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705, Plaintiff State of Maine moves for immediate issuance of an order temporarily restraining Defendants from terminating, freezing, or otherwise interfering with Maine's access to federal funds allocated to Maine based on Maine's alleged violation of Title IX without complying with the requisite statutory and regulatory procedures. The matter is urgent because Defendants have blocked access to federal funds Maine uses to feed at-risk and needy children, as well as vulnerable adults.

Several weeks ago, Maine Governor Janet Mills was directly challenged by President Donald Trump regarding whether Maine would comply with his Executive Order ("EO") relating to the participation of transgender athletes in school sports. Governor Mills did not agree to bow to the President's unlawful directive and instead stated that Maine would comply with federal and state law. Since then, the Trump Administration has engaged in an unlawful campaign of coercion by threatening to terminate Maine's federal funding for Maine's refusal to comply with the President's EO. Until recently, no funding has been terminated because, as other parts of the

Trump Administration presumably recognize, there are statutory and regulatory processes (which include judicial review) that must be followed.

But President Trump's Secretary of Agriculture – Brooke Rollins – apparently does not understand this. Last week, she notified Maine's Governor that she was freezing federal funds that the United States Department of Agriculture ("USDA") is obligated to provide to the State of Maine to support feeding children and vulnerable adults. Sounding more like a hostage taker seeking a ransom payment than a cabinet-level federal official, Secretary Rollins warned that "[t]his is only the beginning" of the federal government's funding freezes directed at the State of Maine, and that the State is "free to end it at any time" by capitulating to the President's demands regarding the participation of transgender athletes in school sports. In this lawsuit, the State of Maine seeks judicial review of Secretary Rollins' action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

The State of Maine is likely to prevail on the merits. Secretary Rollins' action is blatantly unlawful: she cannot simply decree the freezing of federal funds to which the State of Maine is entitled. Rather, she must follow the requisite procedures, which, among other things, would give the State of Maine the opportunity to refute the Secretary's erroneous claim that Title IX prohibits schools from allowing transgender girls and women from participating on girls' and women's teams. In fact, several federal courts have held that Title IX requires schools to <u>permit</u> such participation. The State of Maine will be irreparably harmed in the absence of a temporary restraining order. Without federal funds, state employees who administer school food programs will be laid off, food providers will not be able to purchase food or pay staff to prepare and serve food, and schools will not be reimbursed for meals they provide. In short, children, as well as some vulnerable adults, will go hungry. Feeding children is clearly in the public interest, as is

2

requiring Defendants to comply with the law. Defendants will face no hardship if they are ordered to unfreeze funds and follow the requisite processes before again interfering with the State of Maine's funding. The State is entitled to emergency relief.[1]

## Statutory and Regulatory Background

### *Title IX*

Title IX of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Nothing in Title IX prohibits schools from allowing transgender girls and women to participate on girls' and women's sports teams. To the contrary, various federal courts have held that Title IX and/or the Equal Protection Clause require schools to <u>allow</u> such participation. *See, e.g., B.P.J. v. West Va. State Bd. Of Ed.*, 98 F.4th 542 (4th Cir.), *cert. denied*, 145 S. Ct. 568 (2024); *Doe v. Horne*, 115 F.4th 1083 (9th Cir. 2024); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19 (D.N.H. 2024); *Doe v. Hanover Cnty. Sch. Bd.*, No. 3:24CV493, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024).

To enforce Title IX, Congress directed every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of" 20 U.S.C. § 1681 "by issuing rules, regulations, or orders of general applicability." 20 U.S.C. § 1682. Congress authorized federal agencies to enforce compliance with the requirements of their Title IX regulations in two ways: 1) "by the termination of or refusal to grant or to continue [financial] assistance . . . to any

---

[1] Fed. R. Civ. P. 65(c) states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But the Court has the discretion to not require a bond. *Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021). The Court should exercise that discretion here. USDA's withholding of funds is plainly unlawful, and the State should not have to put up security to get what it is entitled to.

recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement" or 2) "by any other means authorized by law." 20 U.S.C. § 1682. Before taking an action to terminate or refuse to grant or continue federal financial assistance, an agency must first "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." *Id*.

### *USDA's Title IX Regulations*

USDA's regulations implementing Title IX are at 7 C.F.R. Part 15a. The regulations require covered entities to "provide equal athletic opportunity for members of both sexes," 7 C.F.R. § 15a.450, but they do not address the participation of transgender athletes in athletic programs. For enforcement, the regulations adopt USDA's procedures for enforcing Title VI of the Civil Rights Act of 1964. 7 C.F.R. § 15a.605 (adopting and applying 7 C.F.R. §§ 15.5-15.11 and 15.60-15.143).

Under those enforcement regulations, USDA "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with the regulations and this part and shall provide assistance and guidance to recipients to help them comply voluntarily with the regulations in this part." 7 C.F.R. § 15.5. "In the event of noncompliance," USDA "shall seek to secure voluntary compliance by all appropriate means." *Id*.

If there appears to be noncompliance, and it cannot be corrected by informal means, compliance can be effected "by the suspension or termination of or refusal to grant or to continue Federal financial assistance, upon a finding, in accordance with the procedure hereinafter

prescribed, or by any other means authorized by law." 7 C.F.R. § 15.8(a). Such "other means" include, but are not limited to,

> (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law.

*Id*.

The regulations require USDA to take specific steps before it can terminate, or refuse to grant or continue, financial assistance. First, USDA must have "advised the applicant or recipient of his failure to comply and . . . determined that compliance cannot be secured by voluntary means." 7 C.F.R. § 15.8(c). Second, USDA must have made "an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply" with the regulations. *Id*.[2] Third, the Secretary must have approved of the termination action by issuing a final decision pursuant to 7 C.F.R. § 15.10(e). *Id*. Fourth, the Secretary must have "filed with the committee of the House and the committee of the Senate, having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action," and then must have waited at least 30 days after filing the report before taking any funding action. *Id*. Defendants did not take a single one of these steps here.

When "other means authorized by law" (i.e., a referral to the Department Justice) are used, the Secretary must have (1) "determined that compliance cannot be secured by voluntary means;" (2) notified the recipient "of its failure to comply and of the action to be taken to effect compliance;" and (3) waited at least ten days after notifying the recipient before taking action.

---

[2] When an opportunity for a hearing is required, USDA must comply with the process set forth in 7 C.F.R. §§ 15.9-15.10 and 15.60-15.143.

7 C.F.R. § 15.8(d). Here, the Secretary's freezing of funds was not a "means authorized by law," but, even if it were, she did not comply with any of these requirements.

### *Maine's Anti-Discrimination Law*

The Maine Human Rights Act ("MHRA") broadly prohibits discrimination against various protected classes in various areas, including education. 5 M.R.S. §§ 4551-4634. The MHRA prohibits schools from "[d]eny[ing] a person equal opportunity in athletic programs" based on, among other things, gender identity. 5 M.R.S. § 4602(1). The Maine Human Rights Commission ("MHRC"), which implements and enforces the MHRA, has provided guidance regarding application of the education provisions of the MHRA. *See* Memo dated Jan. 13, 2016 from MHRC counsel.[3] The guidance states: "Whenever educational or extra-curricular opportunities offered by a covered educational institution are offered separately to students based on sex and/or gender, students shall be allowed to participate in accordance with their gender identity." *Id*. The MHRC's guidance further states: "Students should be allowed to compete on single-sex/gender teams based upon their gender identity." *Id*.[4]

### *President Trump's Executive Orders*

President Donald J. Trump was sworn in as President of the United States on January 20, 2025. That same day, he issued Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," referred to here as the "Biological Truth EO."[5] The EO declares: "It is the policy of the United States to recognize

---

[3] *See* https://www.maine.gov/mhrc/sites/maine.gov.mhrc/files/inline-files/CCmemo.education.so_.pdf.

[4] The MHRC's guidance also provides:
> If the participation of a transgender student on the single-sex/gender team that most closely matches the student's gender identity poses a significant risk of substantial physical harm to the student or to other participants, the educational institution and the student shall enter into interactive discussions to minimize or eliminate the threat of substantial harm, while also providing mutually-acceptable athletic opportunity for the student.

[5] *See* https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government

two sexes, male and female." *Id.*, at § 2. "These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* It further states: "'Sex' shall refer to an individual's immutable biological classification as either male or female." *Id.*, at § 2(a). "'Sex' is not a synonym for and does not include the concept of 'gender identity.'" *Id.* The Biological Truth EO defines "women" and "girls" as "adult and juvenile human females, respectively." *Id.*, at § 2(b). "Female" is defined as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.*, at § 2(d). The EO defines "men" and "boys" as "adult and juvenile human males, respectively." *Id.*, at § 2(c). "Male" is defined as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.*, at § 2(e).

On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men Out of Women's Sports," and referred to here as the "Sports EO."[6] The Sports EO incorporates by reference the definitions in the Biological Truth EO. *Id.*, at § 2. The Sports EO states: "In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports." *Id.*, at § 1. The Sports EO announces that "it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." *Id.*, at § 2.

The Sports EO directs the Secretary of Education to

> prioritize Title IX enforcement actions against educational institutions (including athletic associations composed of or governed by such institutions) that deny female students an equal opportunity to participate in sports and athletic events by requiring them, in the women's category, to compete with or against or to appear unclothed before males.

---

[6] *See* https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports.

7

*Id*., at § 3(a)(iii).  It also orders "[a]ll executive departments and agencies" to "review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id*., at § 3(b).

### *President Trump Targets Maine*

On February 20, 2025, President Trump stated at a gathering of Republican governors that he heard "men are still playing in Maine." *See* "Remarks by President Trump at Republican Governors Association Meeting" (Feb. 20, 2025).[7]  He continued: "[W]ell, I hate to tell you this, but we're not going to give them any federal money. They are still saying we want men to play in women's sports, and I cannot believe that they're doing that. . . so we're not going to give them any money – none whatsoever – until they clean that up." *Id*.

The next day, on February 21, 2025, President Trump addressed a group of governors, including Governor Mills, at a meeting of the National Governors Association.  *See* "Trump administration orders investigation after Gov. Mills publicly defies president over transgender policy," *Portland Press Herald* (Feb. 21, 2025).[8]  President Trump noted that the NCAA had complied with his Sports EO and asked Governor Mills whether she was going to comply with it.[9]  Governor Mills responded: "I'm complying with state and federal law." *Id*.  President Trump responded: "Well, we are the federal law. You'd better do it. You'd better do it, because you're not going to get any federal funding at all if you don't." *Id*.  Governor Mills responded: "See you

---

[7] *See* https://www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-at-republican-governors-association-meeting.
[8] *See* https://www.pressherald.com/2025/02/21/trump-threatens-to-cut-federal-funding-to-maine-over-transgender-athlete-policy.
[9] On February 6, 2025, the day after President Trump issued the Sports EO, the NCAA announced that it was changing its transgender student-athlete participation policy and that the new policy "limits competition in women's sports to student-athletes assigned female at birth only."  *See* https://www.ncaa.org/news/2025/2/6/media-center-ncaa-announces-transgender-student-athlete-participation-policy-change.aspx.

in court." *Id*. President Trump then said: "I look forward to that – that should be a real easy one." *Id*.[10]

That very same day – February 21, 2025 – the United States Department of Education's Office for Civil Rights ("USDOE OCR") sent a letter to the Commissioner of the Maine Department of Education ("MDOE") stating that it was initiating an investigation into MDOE's alleged violation of Title IX by virtue of Maine high schools "allow[ing] males to participate in girl's interscholastic athletics, thereby depriving girls and young women of equal athletic opportunities." *See* Exhibit A to Complaint. The USDOE OCR is demanding that MDOE execute a resolution agreement by April 11, 2025, or it will refer the matter to the United States Department of Justice ("US DOJ"). *See* Exhibit F to Complaint.

Also on February 21, 2025, the United States Department of Health and Human Services' Office of Civil Rights ("HHS OCR") sent a letter to Governor Mills and Attorney General Aaron Frey stating that it was "initiating a compliance review" of the MDOE "based upon reports that the Maine Principal's Association, which governs school sports in the state, will continue to allow transgender athletes to compete in women's sports." *See* Exhibit B to Complaint. Just four days later, having apparently completed its "compliance review," HHS OCR advised the State that MDOE was in violation of Title IX. *See* Exhibit G to Complaint. On March 28, 2025, HHS OCR advised the State that it had referred the matter to the US DOJ with a recommendation that US DOJ bring an enforcement action. *See* Exhibit M to Complaint.

On February 25, 2025, United States Attorney General Pam Bondi released to the press a letter to Governor Mills claiming that "[re]quiring girls to compete against boys in sports and

---

[10] Subsequently, President Trump said that he "need[s] a full throated apology from the Governor herself, and a statement that she will never make such an unlawful challenge to the Federal Government again, before this case can be settled." https://thehill.com/homenews/lgbtq/5208797-donald-trump-maine-governor-transgender-sports-policy.

9

athletic events violates Title IX of the Educational Amendments Act of 1972." *See* Exhibit C to Complaint.[11] Attorney General Bondi offered no legal support for this claim. She noted that USDOE OCR and HHS OCR had begun investigations, and the "Department of Justice stands ready to take all appropriate action to enforce federal law." *Id*.[12]

### *The United States Department of Agriculture Shuts Off Funds*

On April 2, 2025, Governor Mills received a letter from Secretary Rollins regarding Maine's alleged non-compliance with Title IX. *See* Exhibit N to Complaint. The letter began by stating:

> You cannot openly violate federal law against discrimination in education and expect federal funding to continue unabated. Your defiance of federal law has cost your state, which is bound by Title IX in educational programming. Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools. This is only the beginning, though you are free to end it at any time by protecting women and girls in compliance with federal law.

*Id*. The letter went on to state that USDA "is additionally reviewing all research and education-related funding in Maine for compliance with the Constitution, federal laws including Titles VI and IX, and the priorities of the Trump Administration." *Id*.

The Secretary's April 2, 2025 letter continued: "In order to continue to receive taxpayer dollars from USDA, the state of Maine must demonstrate compliance with Title IX's protection of female student athletes from having to compete with or against or having to appear unclothed before males." *Id*. The letter also stated that "USDA has launched a full review of

---

[11] Governor Mills did not receive the letter until March 17, 2025.
[12] It is not just MDOE that has been the target of the Trump Administration's campaign. On February 27, 2025, six days after President Trump threatened Governor Mills with the termination of federal funding, the Acting Social Security Administrator emailed his staff regarding terminating Maine's contracts with the Social Security Administration. https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-04-01-gec-to-ssa-dudek-re-maine.pdf. A staff member warned that "[t]erminating the contracts would result in improper payments and potential for identity theft." *Id*. The Administrator responded: "Please cancel the contracts. While our improper payments will go up, and fraudsters may compromise identities, no money will go from the public trust to a petulant child," referring to Governor Mills.

10

grants awarded by the Biden Administration" to MDOE, that "[m]any of these grants appear to be wasteful, redundant, or otherwise against the priorities of the Trump Administration," and that "USDA will not extend the Biden Administration's bloated bureaucracy and will instead focus on a Department that is farmer-first and without a leftist social agenda." *Id*.

In her April 2, 2025 letter, Secretary Rollins claimed that the freeze would "not impact federal feeding programs or direct assistance to Mainers," and that "if a child was fed today, they will be fed tomorrow." *Id*. This is not true – as discussed below, the funding freeze will prevent children and vulnerable adults from being fed, and either the Secretary does not understand how USDA's programs work, or she is intentionally misrepresenting the effects of the freeze.

## Argument

"To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction." *Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018); *see also Baber v. Dunlap*, 349 F. Supp. 3d 68, 74 (D. Me. 2018). Accordingly, the Court must consider four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). "The sine qua non of this four-part inquiry is likelihood of success on the merits." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). "[T]rial courts have wide discretion in making judgments regarding the appropriateness of [preliminary injunctive] relief." *Francisco

*Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).  Here, all of the factors support issuing a temporary restraining order.[13]

### *Maine is likely to prevail on the merits.*

As a threshold matter, Defendants' action freezing federal funds based on the State of Maine's alleged violation of Title IX is reviewable under the APA.  Congress has expressly declared that actions by federal agencies "terminating or refusing to grant or to continue financial assistance" upon a finding of a violation of Title IX are subject to judicial review in accordance with the APA, and "such action shall not be deemed committed to unreviewable agency discretion within the meaning of [5 U.S.C. § 701]."  20 U.S.C. § 1683.  Without question, this Court may review the Secretary's unlawful action.

Under the APA, a reviewing court may hold unlawful and set aside an agency action that is arbitrary, capricious, not in accordance with law, or was taken "without observance of procedure required by law."  5 U.S.C. § 706.  Secretary Rollins' action is all of these things.

Most obviously, the Secretary's action was not in accordance with law and was taken without observance of the required legal procedures.  The Secretary cannot simply declare that the State of Maine is in violation of Title IX and terminate federal funding.  Congress has expressly declared that to terminate or refuse to continue federal financial assistance to a recipient, the agency must first hold a hearing and then make an "express finding on the record" that the recipient violated Title IX.  20 U.S.C. § 1682.  USDA's own regulations also require a hearing and an express finding on the record.  7 C.F.R. § 15.8(c).  USDA's regulations impose additional requirements beyond those established by Congress.  It must first notify the recipient of its failure

---

[13]  A temporary restraining order may be issued here not only pursuant to Fed. R. Civ. P. 65(b), but also pursuant to the APA.  5 U.S.C. § 705 (stating that a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceeding").

to comply and consider securing compliance by voluntary means. *Id*. The Secretary must issue a final decision pursuant to 7 C.F.R. § 15.10(e). Finally, under both federal law and USDA's regulations, the Secretary must file with the appropriate House and Senate committees "a full written report of the circumstances and the grounds" for the contemplated action and then wait at least 30 days before taking the action. 20 U.S.C. § 1682; 7 C.F.R. § 15.10(e).

The Secretary did not do any of these things. Instead, without any prior notice, opportunity for a hearing, finding on the record, or report to Congress, she terminated the State of Maine's federal funding. This termination is both not in accordance with law and in violation of required legal procedures and must be set aside.

The Secretary's action is also arbitrary and capricious. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). Here, the Secretary offered no explanation for her determination that the State of Maine is in violation of Title IX. She did not cite to any provision in Title IX or USDA's implementing regulations prohibiting schools from allowing transgender girls and women to play on girl's and women's teams. She did not cite any case supporting such a proposition. She simply declared her interpretation of Title IX without providing a single bit of legal support.

And even if the Secretary's interpretation were correct (it is not), she did not explain why MDOE is somehow in violation of Title IX because schools in Maine allow (as they should) transgender girls and women to play on girl's and women's teams. She did not cite any state law

13

or other authority giving MDOE control over how schools choose to operate their athletic programs. In short, she provided no basis for her determination that the State of Maine is in violation of Title IX.

The Secretary ignored all legally required procedures and provided no basis for her action terminating the State of Maine's funding. The State is likely to prevail on the merits.

*Maine will suffer irreparable harm if a temporary restraining order is not issued.*

If emergency relief is not granted, hungry children and vulnerable adults will not be fed (despite Secretary Rollins' claim to the contrary). An explanation of how the State of Maine's food programs work is necessary. MDOE operates the Child Nutrition Program ("CNP"), which administers several federal programs designed to fight hunger by reimbursing organizations such as schools, childcare centers, and after-school programs for providing healthy free or reduced-price meals to children. McLucas Decl., ¶ 1. Two such programs that CNP administers are the National School Lunch Program and the School Breakfast Program. *Id*., ¶ 4. These programs reimburse public and private schools for providing free or reduced-price lunches and breakfasts to eligible students. *Id*. The CNP processes claims from schools under these programs and provides reimbursements from the federal funds it receives from USDA. *Id*.

CNP also receives federal funds from USDA for the Child and Adult Care Food Program ("CACFP"), state level operating costs, Child Nutrition Non-Competitive Technology Innovation Grants ("nTIG"), National School Lunch Program Equipment Assistance Grants, and Farm to School State Formula Grants. *Id*., ¶ 5. CACFP provides meals for young children who attend daycare programs, at-risk school-age children outside of school hours, and adults in adult daycare programs. *Id*., ¶ 6. There are three financial subcomponents to CACFP: food reimbursement, which reimburses sponsors and sites for meals actually served; cash in lieu, which is paid to

14

sponsors and sites in lieu of their accessing commodity foods offered by USDA at discounted rates,[14] and administrative funds, which go to sponsors to pay the costs of preparing and providing the meals and administering the local programs. *Id.*

The state level operating costs pay for the salaries of the CNP employees (within MDOE) charged with monitoring compliance and processing the reimbursements to schools and other sponsors for all of the USDA-funded child nutrition programs, as well as necessary office expenses, such as computers, phones, and other office supplies. *Id.*, ¶ 7. nTIG pays for CNPweb, the computer program through which schools and other program sponsors interface with MDOE to submit claims and receive reimbursement. *Id.*, ¶ 8. The National School Lunch Program Equipment Assistance Grant reimburses schools for the purchase of commercial grade kitchen equipment used to make the food for their child nutrition programs. *Id.*, ¶ 9. The Farm to School State Formula Grant pays for regional coordinators who work with farmers and schools to increase the capacity of schools to procure and use local foods. *Id.*, ¶ 10.

For the current fiscal year, CNP received or was due to receive approximately $49,189 for CACFP cash in lieu, $97,085 for CACFP administrative funds, $990,817 for state level operating costs, and $698,507 for nTIG. *Id.*, ¶ 13. Prior year funds that were awarded but are currently inaccessible are $592,838 for the Farm to School State Formula Grant, $68,952 for state level operating costs, $218,517 for nTIG, and $37,544 for the National School Lunch Program Equipment Assistance Grant. *Id.* CNP was anticipating funding of approximately $3 million, typically awarded in July of each year, for summer meal program sponsor administration and meal reimbursement. *Id.*

[14] The discounted commodity foods are distributed in large quantities. McLucas Decl., ¶ 14. In Maine, the sites and providers are too small to access these foods because the foods could not be properly stored or managed without significant waste. *Id.*

On April 3, 2025, the day after Secretary Rollins sent her letter to Governor Mills, CNP was unable to access several sources of federal funds. *Id*., ¶ 12. While the CACFP account for food reimbursement was accessible, cash in lieu and administrative funds were inaccessible. *Id*. All of the accounts for state level operating costs, the National School Lunch Program Equipment Assistance Grant, and the Farm to School State Formula Grant were also inaccessible. *Id*.

The inaccessibility of two of the funding streams in the CACFP grants directly impairs the ability of CNP to feed children. *Id*., ¶ 14. First, without access to the cash in lieu account, providers have no funds to purchase the food that is distributed to children and adults in daycare settings. *Id*. Second, without access to the administrative funds account, providers have no funds to pay the individuals who run the programs that prepare and provide food to children and adults. *Id*. In sum, without access to these two accounts, CACFP will have to cease operations and children (and vulnerable adults) will not be fed. *Id*.

Secretary Rollins' action also cripples Maine's National School Lunch Program and School Breakfast Program. Although the accounts holding funds to reimburse schools for providing meals under these programs are still accessible, the funds that pay for the twelve CNP employees (within MDOE) who monitor the programs and process the reimbursements to the schools are inaccessible. *Id*., ¶ 15. Unless an alternate funding source can be immediately identified, these employees will be laid off. *Id*. Also inaccessible are the funds that pay for the computers, telephones, and other equipment that CNP employees use to monitor the National School Lunch Program and the School Breakfast Program and process the reimbursements. *Id*., ¶ 16.

Without staff and equipment, there will be no way for Maine to collect, approve, and process claims for reimbursement from schools and other facilities providing meals to schoolchildren. *Id*., ¶ 17. Because the State has no state funds available to replace the funds that

have been frozen, the lack of staff and equipment means that USDA funds will not reach the schools and other facilities, and children will not be fed. *Id*., ¶¶ 17, 20.[15] In short, Secretary Rollins blew up the bridge necessary to get funds from USDA to the schools and other entities that need the funds to feed children and vulnerable adults.

### *The public interest and the balancing of the hardships warrant a temporary restraining order.*

Here, the principal public interest is ensuring that needy children and vulnerable adults are fed. As set forth above, that interest cannot be served if MDOE continues to be denied access to federal funds. Further, "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Conversely, "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). In addition to the public's interest in feeding children and vulnerable adults, the public has an interest in ensuring that USDA follows the law. And for the reasons described above, USDA is not doing so.

On the other side of the ledger, the federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Planned Parenthood of N.Y.C., Inc.*, 337 F. Supp. 3d at 343. Because USDA's funding freeze was unlawful, Defendants have no cognizable interest in it being continued.

---

[15] Loss of CNP staff will make it impossible for CNP to oversee and monitor the local programs, resulting in the loss of program integrity, including inconsistent meal quality and reduced outreach to low-income families, thus widening the gaps in access to healthy meals for children who depend on these programs. McLucas Decl., ¶ 18. It will also impair the State's ability to comply with USDA regulations, which could jeopardize the integrity of child nutrition programs, and permit fraud, waste, and abuse of federal dollars. *Id*., ¶ 19.

Finally, Defendants will not burdened or otherwise harmed by a restraining order. The order would not prevent Defendants from moving forward with efforts to terminate federal funding for Maine's alleged violation of Title IX. They would simply need to do so through the legally required processes. Following the law is not a burden.

### *Conclusion*

For the reasons set forth above, the State of Maine respectfully requests that the Court enter a temporary restraining order barring Defendants from freezing, terminating, or otherwise interfering with the State of Maine's federal funding for alleged violations of Title IX without complying with the legally required procedures.

Dated: April 7, 2025                                Respectfully submitted,

AARON M. FREY
Attorney General

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Chief Deputy Attorney General
Christopher.C.Taub@maine.gov
SARAH A. FORSTER
Assistant Attorney General
Sarah.Forster@maine.gov
Office of the Attorney General
State House Station 6
Augusta, ME 04333
Telephone: (207) 626-8800