## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| STATE OF MAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00131-JAW |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE and BROOKE | ) | INJUNCTIVE RELIEF SOUGHT |
| ROLLINS, in Her Official Capacity as | ) | |
| Secretary of Agriculture, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT (VERIFIED)

### INTRODUCTION

1.  In this lawsuit, the State of Maine challenges under the Administrative Procedure Act (5 U.S.C. §§ 701-706) a blatantly unlawful action taken by the United States Secretary of Agriculture freezing federal funds allocated to Maine to feed schoolchildren.  The Secretary took this action without following any of the statutory and regulatory requirements that must be complied with when terminating federal funds based on alleged violations of Title IX.  Instead, without any prior notice, investigation, administrative proceeding, or other semblance of legally sufficient process, the Secretary simply sent a letter to Maine's Governor announcing the freeze and warning that "[t]his is only the beginning."

2.  The Secretary claimed that she was taking this action because the State of Maine is allegedly violating Title IX of the Civil Rights Law of 1964 by permitting transgender girls and women to participate in girls' and women's school sports.  The Secretary

provided no legal basis for her interpretation of Title IX, and her interpretation is wrong. Indeed, several federal courts have held that Title IX and the Equal Protection Clause require schools to <u>permit</u> transgender girls and women to play on girls' and women's teams.

3.  There is no need, though, for the Court to interpret Title IX here (at least not in this lawsuit).  Even if the State of Maine were in violation of Title IX (and, to be clear, it is not), there are statutory and regulatory requirements that the federal government must comply with before it may freeze federal funds owed to a state.  The Secretary followed none of those procedures here.  Her action is arbitrary, capricious, not in accordance with law, and did not observe procedures required by law.  The Court should vacate the Secretary's action and enter a temporary restraining order and a preliminary and permanent injunction barring Defendants from freezing federal funds allocated to the State of Maine or any of its departments for alleged violations of Title IX, unless and until Defendants comply with the prescribed procedural requirements.

<u>JURISDICTION AND VENUE</u>

4.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

5.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).  Defendants are a United States agency and an officer of the United States sued in her official capacity.  The State of Maine is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Maine.

<u>PARTIES</u>

6. The State of Maine is a sovereign state of the United States of America.  The State of Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 MR.S. § 191.

7. Defendant United States Department of Agriculture ("USDA") is a cabinet agency within the executive branch of the United States government.

8. Defendant Brooke Rollins is the Secretary of Agriculture and is the highest-ranking official of the USDA.  She is sued in her official capacity.

<u>FACTUAL ALLEGATIONS</u>

### *Title IX*

9. Title IX provides in pertinent part that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ."  20 U.S.C. § 1681(a).

10. Nothing in Title IX prohibits schools from allowing transgender girls and women to participate on girls' and women's sports teams, and, in fact, several federal courts have held that Title IX and/or the Equal Protection Clause require schools to allow such participation.

11. To enforce Title IX, Congress "authorized and directed" every federal agency providing financial assistance to education programs or activities to "effectuate the provisions of" 20 U.S.C. § 1681 "by issuing rules, regulations, or orders of general applicability."  20 U.S.C. § 1682.

12. Congress authorized federal agencies to enforce compliance with the requirements of their Title IX rules and regulations "by the termination of or refusal to grant or to continue [financial] assistance . . . to any recipient as to whom there has been an express finding

3

on the record, after opportunity for hearing, of a failure to comply with such requirement" or "by any other means authorized by law." *Id*.

13. Before taking an action to terminate, or to refuse to grant or continue, federal financial assistance, an agency must first "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." *Id*.

14. Congress expressly declared that any action by a department or agency terminating financial assistance is subject to judicial review, that "any State" may obtain judicial review, and that the federal agency's action "shall not be deemed committed to unreviewable agency discretion." 20 U.S.C. § 1683.

### *USDA's Title IX Regulations*

15. USDA's regulations implementing Title IX are codified at 7 C.F.R. Part 15a.

16. USDA's regulations require covered entities to "provide equal athletic opportunity for members of both sexes," 7 C.F.R. § 15a.450, but they do not expressly address the participation of transgender athletes in athletic programs.

17. For enforcement, the regulations adopt USDA's procedures for enforcing Title VI of the Civil Rights Act of 1964. 7 C.F.R. § 15a.605 (adopting and applying 7 C.F.R. §§ 15.5-15.11 and 15.60-15.143).

18. Under the regulations for enforcing Title VI, USDA "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with the regulations and this part and shall provide assistance and guidance to recipients to help them comply voluntarily with the regulations in this part." 7 C.F.R. § 15.5.

19. "In the event of noncompliance, [USDA] shall seek to secure voluntary compliance by all appropriate means." *Id*.

20.  If there appears to be noncompliance, and it cannot be corrected by informal means, compliance can be effected "by the suspension or termination of or refusal to grant or to continue Federal financial assistance, upon a finding, in accordance with the procedure hereinafter prescribed, or by any other means authorized by law." 7 C.F.R. § 15.8(a).

21.  Such "other means" include, but are not limited to, "(1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law." *Id*.

22.  "No order suspending, terminating, or refusing to grant or to continue Federal financial assistance shall become effective until (1) the Agency has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with the requirement imposed by or pursuant to the regulations in this part, (3) the action has been approved by the Secretary pursuant to § 15.10(e), and (4) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate, having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action." 7 C.F.R. § 15.8(c).

23.  "Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in

its effect to the particular program, or part thereof, in which such noncompliance has been so found." *Id*.

24. "No action to effect compliance by any other means authorized by law shall be taken until (1) the Secretary has determined that compliance cannot be secured by voluntary means, (2) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance, and (3) the expiration of at least ten days from the mailing of such notice to the recipient or other person.  During this period of at least ten days, additional efforts shall be made to persuade the recipient or other person to comply with the regulations in this part and to take such corrective action as may be appropriate."  7 C.F.R. § 15.8(d).

25. When a hearing must be offered, USDA must comply with the process set forth in 7 C.F.R. §§ 15.9-15.10 and 15.60-15.143.

### *Maine's Anti-Discrimination Law*

26. The Maine Human Rights Act ("MHRA") broadly prohibits discrimination against various protected classes in the areas of employment, housing, public accommodations, lending, and education.  5 M.R.S. §§ 4551-4634.

27. With respect to education, the MHRA prohibits schools from "[d]eny[ing] a person equal opportunity in athletic programs" based on, among other things, gender identity. 5 M.R.S. § 4602(1).

28. The Maine Human Rights Commission ("MHRC"), which implements and enforces the MHRA, has provided guidance regarding application of the education provisions of the MHRA.[1]

---

[1] *See* https://www.maine.gov/mhrc/sites/maine.mhrc/files/inline-files/CCmemo.education.so_.pdf.

29. The MHRC's guidance provides: "Whenever educational or extra-curricular opportunities offered by a covered educational institution are offered separately to students based on sex and/or gender, students shall be allowed to participate in accordance with their gender identity." *Id.*

30. The MHRC's guidance further provides: "Students should be allowed to compete on single-sex/gender teams based upon their gender identity." *Id.*

31. The MHRC's guidance further explains: "If the participation of a transgender student on the single-sex/gender team that most closely matches the student's gender identity poses a significant risk of substantial physical harm to the student or to other participants, the educational institution and the student shall enter into interactive discussions to minimize or eliminate the threat of substantial harm, while also providing mutually-acceptable athletic opportunity for the student." *Id.*

### *President Trump's Executive Orders*

32. President Donald J. Trump was sworn in as President of the United States on January 20, 2025.

33. That same day, he issued Executive Order 14168, entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," referred to here as the "Biological Truth EO."[2]

34. The Biological Truth EO declares: "It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.*

---

[2] *See* https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government.

35. The Biological Truth EO asserts: "'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'" *Id.*

36. The Biological Truth EO defines "women" and "girls" as "adult and juvenile human females, respectively." "Female" is defined as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.*

37. The Biological Truth EO defines "men" and "boys" as "adult and juvenile human males, respectively." "Male" is defined as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.*

38. On February 5, 2025, President Trump issued Executive Order 14201, entitled "Keeping Men Out of Women's Sports," and referred to here as the "Sports EO."[3]

39. The Sports EO incorporates by reference the definitions in the Biological Truth EO. *Id.*

40. The Sports EO asserts: "In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports." *Id.*

41. The Sports EO announced that "it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." *Id.*

42. The Sports EO directs the Secretary of Education to "prioritize Title IX enforcement actions against educational institutions (including athletic associations composed of or

---

[3] *See* https://www.whitehouse.gov/presidential-actions/2025/02/keeping-men-out-of-womens-sports.

governed by such institutions) that deny female students an equal opportunity to participate in sports and athletic events by requiring them, in the women's category, to compete with or against or to appear unclothed before males." *Id.*

43.    The Sports EO also directs that "[a]ll executive departments and agencies (agencies) shall review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id.*

44.    On February 6, 2025, the day after President Trump issued the Sports EO, the NCAA announced that it was changing its transgender student-athlete participation policy and that the new policy "limits competition in women's sports to student-athletes assigned female at birth only."[4]

### *President Trump Targets Maine*

45.    On February 20, 2025, President Trump stated at a gathering of Republican governor that he heard "men are still playing in Maine." He continued: "[W]ell, I hate to tell you this, but we're not going to give them any federal money. They are still saying we want men to play in women's sports, and I cannot believe that they're doing that. . . so we're not going to give them any money – none whatsoever – until they clean that up."[5]

46.    The next day, on February 21, 2025, President Trump addressed a group of governors, including Maine Governor Janet Mills, at a meeting of the National Governors Association.[6]

---

[4] *See* https://www.ncaa.org/news/2025/2/6/media-center-ncaa-announces-transgender-student-athlete-participation-policy-change.aspx.
[5] *See* https://www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-at-republican-governors-association-meeting.
[6] *See* https://www.pressherald.com/2025/02/21/trump-threatens-to-cut-federal-funding-to-maine-over-transgender-athlete-policy.

47.  President Trump noted that the NCAA had complied with his Sports EO and asked Governor Mills whether she was going to comply with it.  Governor Mills responded: "I'm complying with state and federal law." *Id*.  President Trump responded:  "Well, we are the federal law.  You'd better do it.  You'd better do it, because you're not going to get any federal funding at all if you don't." *Id*.  Governor Mills responded:  "See you in court." *Id*.  President Trump then said:  "I look forward to that – that should be a real easy one." *Id*.

48.  Subsequently, President Trump said that he "need[s] a full throated apology from the Governor herself, and a statement that she will never make such an unlawful challenge to the Federal Government again, before this case can be settled."[7]

49.  That same day, on February 21, 2025, the United States Department of Education's Office for Civil Rights ("USDOE OCR") sent a letter to the Commissioner of the Maine Department of Education ("MDOE") stating that it was initiating an investigation into MDOE's alleged violation of Title IX by virtue of Maine high schools "allow[ing] males to participate in girl's interscholastic athletics, thereby depriving girls and young women of equal athletic opportunities." *See* Exhibit A.

50.  Also on February 21, 2025, the United States Department of Health and Human Services' Office for Civil Rights ("HHS OCR") sent a letter to Governor Mills and Attorney General Frey stating that it was "initiating a compliance review of the Maine Department of Education (MDOE) based upon reports that the Maine Principal's Association, which governs school sports in the state, will continue to allow transgender athletes to compete

---

[7] *See* https://thehill.com/homenews/lgbtq/5208797-donald-trump-maine-governor-transgender-sports-policy.

in women's sports in violation of President Trump's Executive Order (EO) 14201, 'Keeping Men Out of Women's Sports,' signed on February 5, 2025." *See* Exhibit B.

51. On February 25, 2025, United States Attorney General Pam Bondi released to the press a letter to Governor Mills claiming that "[re]quiring girls to compete against boys in sports and athletic events violates Title IX of the Educational Amendments Act of 1972." *See* Exhibit C. Attorney General Bondi offered no legal support for this claim.

52. Attorney General Bondi stated in the letter that both the USDOE OCR and the HHS OCR had opened Title IX investigations into MDOE.

53. On March 19, 2025, USDOE OCR sent a letter to MDOE's Commissioner advising her that it had completed its "investigation" and determined that "the evidence supports a conclusion of noncompliance with Title IX by MDOE." *See* Exhibit D. Upon information and belief, USDOE OCR did not interview any MDOE personnel or otherwise seek information from MDOE as part of its alleged "investigation."

54. With its March 19, 2025 letter, USDOE OCR provided MDOE with a draft resolution agreement. *See* Exhibit E. MDOE did not execute the agreement.

55. On March 31, 2025, USDOE OCR sent MDOE an "Impasse Letter" informing MDOE that unless MDOE executed an "OCR-approved Resolution Agreement" by April 11, 2025, USDOE OCR would refer the matter to the United States Department of Justice ("US DOJ"). *See* Exhibit F.

56. The State of Maine is not aware of any further action by USDOE OCR or the US DOJ regarding this matter.

57. On February 25, 2025, four days after initiating its compliance review, the HHS OCR sent a letter to the MDOE's Commissioner notifying her that MDOE is in violation of Title IX by "denying female student athletes in the State of Maine an equal opportunity

to participate in, and obtain the benefits of participation, 'in any interscholastic, intercollegiate, club or intramural athletics' offered by the state by allowing male athletes to compete against female athletes in current and future athletic events." *See* Exhibit G.

58. The HHS OCR's February 25, 2025 letter stated that it constituted the notice required as a prerequisite for referring the matter to the US DOJ. *Id*.

59. On February 27, 2025, the HHS OCR sent a proposed "Voluntary Resolution Agreement." *See* Exhibit H.

60. On March 4, 2025, counsel for MDOE responded to the HHS OCR. *See* Exhibit I.

61. On March 5, 2025, the HHS OCR sent an amended notice of compliance review to MDOE adding the Maine Principals Association ("MPA") and Greely High School as respondents. *See* Exhibit J.

62. On March 17, 2025, the HHS OCR sent an amended notice of violation to MDOE, MPA, and Greely High School, along with a revised "Voluntary Resolution Agreement." *See* Exhibits K and L.

63. MDOE declined to execute the Voluntary Resolution Agreement.

64. On March 28, 2025, HHS OCR sent a letter to Governor Mills and others informing them that it was referring MDOE's alleged violation of Title IX to the US DOJ with a recommendation that US DOJ bring an enforcement action. *See* Exhibit M.

65. Upon information and belief, the US DOJ has not initiated any legal proceedings as a result of the referral.

66. On February 27, 2025, six days after President Trump threatened Governor Mills with the termination of federal funding, the Acting Social Security Administrator emailed his staff regarding terminating Maine's contracts with the Social Security Administration. A

staff member warned that "[t]erminating the contracts would result in improper payments and potential for identity theft." *Id*. The Administrator responded: "Please cancel the contracts. While our improper payments will go up, and fraudsters may compromise identities, no money will go from the public trust to a petulant child," referring to Governor Mills.[8]

67. When asked to comment on the Administrator's actions, a White House spokesman stated:

> Governor Mills would rather cater to the anti-science and anti-women lunatics of the transgender movement than uphold her constitutional obligations to the laws of her state, and more importantly the Constitution. President Trump has been clear in his demands and the ball is in the Governor's court. Choosing the rights of men who want to dominate women's sports over the rights of vulnerable women and girls while blatantly ignoring federal law will not end well for the Governor and the people of Maine deserve better.[9]

### The United States Department of Agriculture Shuts Off Funds

68. On April 2, 2025, Governor Mills received a letter from defendant Secretary of Agriculture Brooke Rollins. *See* Exhibit N.

69. The April 2, 2025 letter began by stating:

> You cannot openly violate federal law against discrimination in education and expect federal funding to continue unabated. Your defiance of federal law has cost your state, which is bound by Title IX in educational programming. Today, I am freezing Maine's federal funds for certain administrative and technological functions in schools. This is only the beginning, though you are free to end it at any time by protecting women and girls in compliance with federal law.

---

[8] *See* https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-04-01-gec-to-ssa-dudek-re-maine.pdf.
[9] See https://www.huffpost.com/entry/janet-mills-social-security-maine-leland-dudek_n_67ed2d99e4b0b937ab8f135c

70. That letter went on to state that USDA "is additionally reviewing all research and education-related funding in Maine for compliance with the Constitution, federal laws including Titles VI and IX, and the priorities of the Trump Administration." *Id*.

71. The April 2, 2025 letter continued: "In order to continue to receive taxpayer dollars from USDA, the state of Maine must demonstrate compliance with Title IX's protection of female student athletes from having to compete with or against or having to appear unclothed before males." *Id*.

72. The April 2, 2025 letter also stated that "USDA has launched a full review of grants awarded by the Biden Administration" to Maine DOE, that "[m]any of these grants appear to be wasteful, redundant, or otherwise against the priorities of the Trump Administration," and that "USDA will not extend the Biden Administration's bloated bureaucracy and will instead focus on a Department that is farmer-first and without a leftist social agenda." *Id*.

73. In her April 2, 2025 letter, Secretary Rollins claimed that the freeze would "not impact federal feeding programs or direct assistance to Mainers," and that "if a child was fed today, they will be fed tomorrow." *Id*.

74. Upon information and belief, Secretary Rollins has not filed a report with the appropriate House or Senate committee, as required by 20 U.S.C. § 1682.

### *The Freeze Will Prevent Children From Being Fed*

75. Housed within MDOE is the Child Nutrition Program ("CNP"), which administers several federal programs designed to fight hunger by reimbursing organizations such as

14

schools, childcare centers, and after-school programs for providing healthy meals to eligible children.

76. The CNP has a director, fifteen employees, and five contractors. These individuals are responsible for data management, monitoring and oversight, and finance and accounting. Among other things, these individuals receive reimbursement claims from schools and other sponsors, access federal accounts and draw down the funds, and provide timely reimbursements to the schools and sponsors so that they can operate their programs.

77. The CNP administers and oversees the National School Lunch Program and the School Breakfast Program. These programs reimburse public and private schools for providing free or reduced-price lunches and breakfasts to eligible students. The CNP processes claims from schools under these programs and provides reimbursements

78. CNP receives federal funds from the USDA for, among others, the following programs and initiatives: the Child and Adult Care Food Program ("CACFP"), state level operating costs, Child Nutrition Non-Competitive Technology Innovation Grants ("nTIG"), National School Lunch Program Equipment Assistance Grants, and Farm to School State Formula Grants.

79. CACFP provides meals for young children who attend daycare programs, at-risk school-age children outside of school hours, and adults in adult daycare programs.

80. In Maine, there are 83 CACFP sponsoring organizations, such as public schools and community non-profits, that are responsible for overseeing 186 of their own sites as well as 388 CACFP providers (small family day/adult care providers) where food is served to the target populations.

81. There are three financial subcomponents to CACFP: food reimbursement, which reimburses sponsors and sites for meals actually served; cash in lieu, which is paid to sponsors and sites in lieu of their accessing commodity foods offered by USDA at discounted rates, and administrative funds, which go to sponsors to pay the costs of preparing and providing the meals and administering the local programs.

82. State level operating costs pay for the salaries of the CNP employees (within MDOE) charged with monitoring compliance and processing the reimbursements to schools and other sponsors for all of the USDA-funded child nutrition programs, as well as necessary office expenses, such as computers, telephones, and other office supplies.

83. nTIG pays for CNPweb, the computer program through which schools and other program sponsors interface with MDOE to submit claims and receive reimbursement.

84. The National School Lunch Program Equipment Assistance Grant reimburses schools for the purchase of commercial grade kitchen equipment used to make the food for their child nutrition programs.

85. The Farm to School State Formula Grant pays for regional coordinators who work with farmers and schools to increase the capacity of schools to procure and use local foods.

86. On April 3, 2025, the day after Secretary Rollins sent her letter to Governor Mills, the CNP was unable to access several sources of federal funds.  While the CACFP account for food reimbursement was accessible, cash in lieu [5661CNC] and administrative funds [5660CHA] were inaccessible.  All of the accounts for state level operating costs [3011NOA, 3017NSB], nTIG [6664TIG], the National School Lunch Program Equipment Assistance Grant [3019SLEQ] and the Farm to School State Formula Grant [4312FARM] were inaccessible.

16

87. The inaccessibility of two of the funding streams in the CACFP grants directly impairs the ability of the CNP to feed children.

88. Shutting of the CACFP cash in lieu account prevents providers from using the funds to purchase the food that is distributed to children and adults in daycare settings.

89. Shutting of the CACFP administrative funds account prevents providers from paying the individuals who run the programs that prepare and provide the food to children and adults.

90. Without access to funds in the cash in lieu and administrative funds account, providers will have to cease operations and children (and vulnerable adults) will not be fed.

91. Although the accounts holding funds to reimburse schools for providing meals under the National School Lunch Program and the School Breakfast Program are still accessible, the funds that pay for the twelve CNP employees (within MDOE) who monitor the programs and process the reimbursements to the schools are inaccessible. Unless an alternate funding source can be immediately identified, these employees will be laid off.

92. Also inaccessible are the funds that pay for the computers, telephones, and other equipment that CNP employees use to monitor the National School Lunch Program and the School Breakfast Program and process the reimbursements.

93. Without staff and equipment, there will be no way for CNP staff to collect, approve, and process claims for reimbursement from schools and other facilities providing meals to children and vulnerable adults. There will thus be no way to get funds from the USDA to schools and other facilities, and children will not be fed.

94. Loss of CNP staff also means that there will be no way for CNP to oversee and monitor the local programs, resulting in the loss of program integrity, including inconsistent meal

quality and reduced outreach to low-income families, thus widening the gaps in access to healthy meals for children who depend on these programs.

95. Loss of CNP staff will also impair the State of Maine's ability to comply with USDA regulations, which could jeopardize the integrity of child nutrition programs, and cause fraud, waste, and abuse of federal dollars.

96. The State of Maine does not have state funds available to replace the funds that have been frozen.

<u>CAUSES OF ACTION</u>

**Count I – Violation of the Administrative Procedure Act**

97. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein.

98. Defendants' freezing of federal funds owed to the State of Maine based on the State's alleged violation of Title IX constitutes final agency action subject to review under the APA.  20 U.S.C. § 1683.

99. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

100. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

101. Defendants' action freezing federal funds owed to the State of Maine was not in accordance with law and was without observance of procedure required by law because although the freeze was premised on MDOE's alleged violation of Title IX, Defendants

did not first notify the State of Maine that it was not in compliance, did not conduct an investigation, did not hold a hearing, did not make findings on the record, and did not submit a report to Congress, in violation of 20 U.S.C. § 1682 and 7 C.F.R. §§ 15.5-15.11 and 15.60-15.143 (as incorporated by 7 C.F.R. § 15a.605).

102. Defendants' action freezing federal funds owed to Maine was arbitrary and capricious because although the freeze was premised on MDOE's alleged violation of Title IX as a result of the participation by transgender girls and women on girls' and women's teams in school athletic programs, Defendants provided no legal explanation or legal support for their determination that allowing such participation violates Title IX.

103. Defendants' action freezing federal funds owed to Maine was arbitrary and capricious because although the freeze was premised on MDOE's alleged violation of Title IX as a result of the participation by transgender girls and women on girls' and women's teams in school athletic programs, Defendants failed to explain how MDOE is responsible for, or has control over, school athletic programs in Maine.

104. Defendants acted contrary to law by failing to provide for judicial review of its action freezing federal funds owed to Maine for MDOE's alleged violation of Title IX.

<u>PRAYER FOR RELIEF</u>

For relief, the State of Maine requests that the Court:

A. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside Defendants' action freezing funds allocated to the State of Maine and any other further actions taken by Defendants to implement their freeze on federal funds allocated to Maine.

B. Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that Defendants' freezing of federal funds allocated to the State of Maine is an unlawful act that violated the APA.

C.  Preliminarily and permanently enjoin Defendants from terminating, freezing, or otherwise impeding access to federal funds allocated to any official, agency, or department of the State of Maine based on MDOE's alleged violation of Title IX, without following all legally required procedures.

D.  Award the State of Maine its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

E.  Grant other such relief as this Court deems appropriate, just, and proper.

Dated: April 8, 2025                         Respectfully submitted,

                                             AARON M. FREY
                                             Attorney General

                                             /s/ Christopher C. Taub
                                             CHRISTOPHER C. TAUB
                                             Chief Deputy Attorney General
                                             Christopher.C.Taub@maine.gov
                                             SARAH A. FORSTER
                                             Assistant Attorney General
                                             Sarah.Forster@maine.gov
                                             Office of the Attorney General
                                             State House Station 6
                                             Augusta, ME 04333
                                             Telephone: (207) 626-8800

## VERIFICATION OF COMPLAINT

I, Sarah A. Forster, declare:

1.   I am an Assistant Attorney General employed by the Maine Office of the Attorney General, Litigation Division.

2.   The Attorney General is authorized to pursue this action on behalf of the State of Maine pursuant to 5 M.R.S. § 191.

3.   I verify that the foregoing Verified Complaint for and on behalf of the State of Maine was duly prepared under the direction of the Attorney General of the State of Maine; that the facts stated therein have been assembled by authorized employees and counsel for the State of Maine; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

4.   I declare under penalty of perjury that the foregoing is true and correct.

/s/ Sarah A. Forster
SARAH A. FORSTER