**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| STATE OF MAINE,<br><br>       Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE and BROOKE ROLLINS, in Her Official Capacity as Secretary of Agriculture,<br><br>       Defendants. | No. 1:25-cv-00131-JAW |

**OPPOSITION TO STATE OF MAINE'S MOTION**
**FOR EMERGENCY TEMPORARY RESTRAINING ORDER**

Defendants, the United States Department of Agriculture ("USDA") and Secretary of Agriculture Brooke Rollins ("the Secretary"), by and through undersigned counsel, oppose the State of Maine's Motion for Emergency Temporary Restraining Order. *See* Dkt. #3, Apr. 7, 2025 (the "Motion" or "Mot."). In support, Defendants submit as follows.

**I.  Preliminary Statement**

The State seeks a temporary restraining order requiring USDA to resume certain payments paused by USDA due to Maine's noncompliance with Title IX. Such monetary harms are generally not irreparable. That is certainly true in this case brought by the State, a plaintiff with an annual budget numbering in the billions seeking extraordinary relief focused on less than $3 million dollars. The Court should resolve this suit in the ordinary course rather than entering provisional relief, especially where the Court's jurisdiction is at best unclear.

1

The Motion more specifically challenges the Secretary's finding that the State has violated and continues to violate Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"). The Secretary, having found the State noncompliant with Title IX, paused certain grant funding previously paid by USDA's Food, Nutrition, and Consumer Services to the Maine Department of Education ("MDOE"). Yet the merits of the underlying Title IX dispute are not front-and-center here. At issue, instead, is the State's process-based effort to temporarily forestall USDA's funding suspension, even while acknowledging that Defendants are not otherwise prevented "from moving forward with efforts to terminate federal funding for Maine's alleged violation of Title IX." Mot. at 18. For the State, success on the merits means deferring litigation of the underlying Title IX funding freeze. The State seeks additional notice, opportunity for a hearing, and written findings, despite its full awareness of the payment termination.

As a threshold matter, the State cannot establish the degree of irreparable harm prerequisite to this Court entering a temporary restraining order. The freeze on the USDA funding at issue—with just a single exception—was never meant or earmarked for purchasing food for children. And there is every indication here that the State can cover any shortfalls. Beyond that, the State has not carried its burden of establishing a sufficient likelihood of success on the merits to justify the extraordinary remedy it seeks here because, as recently identified by this Court, the State initiated this lawsuit on an indeterminant jurisdictional basis. *See* Order to Respond, Dkt. #9, April 9, 2025. Finally, the remaining equitable factors cut against immediate, emergency injunctive relief.

## II.  Procedural and Factual Background

1.      **Case Background**

On April 7, 2025, the State filed this action seeking preliminary and permanent injunctions and declaratory relief. Dkt. #1. Appended to and filed with the unverified Complaint were 14 exhibits (Exhibits A through N), comprising copies of official correspondence exchanged between the parties and their representatives. *Id.* Accompanying the filing of the Complaint on April 7, 2025, was the Motion. Dkt. #3.

On April 8, 2025, the Court held a telephonic conference of counsel. Dkt. #7. Following the telephonic conference, Defendants' deadline to file their response to the Motion was set for today, April 9, 2025. Dkt. #7.[1] Later on April 8, 2025, the State filed a Verified Amended Complaint. Dkt. #8. The same 14 exhibits (Exhibits A through N)[2] were appended to and filed with the Verified Amended Complaint. *Id.* There is no substantive variation between the original and amended pleadings.

Given the accelerated progress of this case, USDA remains actively engaged in assessing the State's allegations and developing additional facts. For purposes of the Motion, however, the official correspondence appended to the Verified Amended Complaint adequately sets forth some of the facts relevant to the resolution of this Motion. The allegations covering the sequence of events and statements made by and between the parties (to include the United States Department of Education

---

[1]      The State is permitted a reply on April 10, 2025. *Id.*

[2]      As confirmed by undersigned counsel during yesterday's telephonic conference, there is no dispute that Exhibits A through N to the Verified Amended Complaint are true and correct copies of official correspondence exchanged between the parties. Defendants consent to the Court considering the contents of all such materials in adjudicating the pending Motion, either as matters judicially noticeable or incorporated by reference through the State's verified pleading. *See* FED. R. EVID. 201(b)(2); FED. RULE CIV. P. 10(c).

("Education") and United States Department of Health and Human Services ("HHS")),

for example, are accurately quoted by reference to the underlying source material. *See*

Verified Am. Compl. ¶¶ 45-74. As the Secretary made clear in those materials, "if a child

was fed today, they will be fed tomorrow." Dkt. #8-14 (Ex. N.).

> ### 2.    Suspending Funding will not Prevent Children from Being Fed

Along with the Motion, the State submitted the Declaration of MDOE's Child

Nutrition Director Jane McLucas, in which the declarant claims that the suspension will

irreparably harm the State by depriving its students of nutritional programs. *See* Dkt.

#3-1 & Verified Am. Compl. ¶¶ 75-86. But put simply, the programs at issue—with only

one possible exception—are not used to purchase food for children. *See* Declaration of

Shiela Corley ("Corley Decl."), Apr. 9, 2025, submitted contemporaneously herewith:

***The Farm to School State Formula Grant.*** The amount currently frozen for

this program is $592,838.42. However, the funds are not used or intended to be used to

purchase food. The specific objectives of this funding are, instead: (a) to build and

increase the capacity of participating institutions to procure and use local food in

program meals; and (b) to provide agricultural education opportunities for participants.

Activities conducted by States to support farm to school may include but are not limited

to local food procurement capacity building and coordination (such as value chain

coordination, grower/buyer matching tools, etc.), training and technical assistance for

local producers and program operators, local food promotional and educational

activities for participating institutions and children (such as Harvest of the Month

promotions or "crunches"), and outreach to local producers or participating institutions

not engaged in farm to school. States may directly fund State-level farm to school staff

and projects and may choose to provide funds to partner organizations to conduct

allowable activities, or to participating institutions, through contracts, subrecipients, or incentive payments.

***Child Nutrition Technology Innovation (TIG) Grants.*** These grants provide funding to every state, Indian tribal organization, and territory administering these programs, supporting planning and implementation activities aimed at improving efficiency, accountability and overall program integrity. States can use the funds to conduct feasibility studies, review data and processes, assess training needs, and plan for automation projects. Implementation efforts may include developing web-based software, improving system interfaces, purchasing technology and hardware, hiring specialized contractors, and training staff and local operators. The amounts currently frozen for this program are $117,405.30, $101,111.38, and $698,507.00. These funds are not used or intended to be used to purchase food.

***State Administrative Funds.*** These funds may be used by State agencies to pay salaries, including employee benefits and travel expenses for administrative and supervisory personnel, for support services, for office equipment, and for staff development, particularly for monitoring and training of food service personnel at the local level in areas such as food purchasing and merchandizing. Such funds shall be used to employ additional personnel, as approved in the applicable State plan, to supervise, improve management, and give technical assistance to school food authorities and to institutions in their initiation, expansion, and conduct of any programs for which the funds are made available. State agencies may also use these funds for their general administrative expenses in connection with any such programs, including travel and related expenses. The amounts currently frozen for this program are $68,951.23, $25,950.00, and $374,753.89. In addition, $122,572.93 exists in Fiscal Year 2024 Q3

funds which are not to be distributed. These funds are not used or intended to be used to purchase food.

*School Meal Equipment Grants.* These grants are provided to States to make subgrants to local educational agencies and schools to purchase the equipment needed to serve healthier meals, improve food safety, and to help support the school breakfast program.  Local operators—including local education agencies, school food authorities, and schools—apply and are awarded funding to purchase equipment with a value of greater than $1,000. The amount currently frozen for this program is $37,544.00. These funds are not used or intended to be used to purchase food.

*Child and Adult Care Food Program Sponsor Administrative Funds.* These funds are used to make administrative payments to day care home sponsoring organizations to help offset administrative costs. Federal reimbursement is based on the number of homes claimed multiplied by the rate established by the Federal government each year. The amounts currently frozen for this program are $71,135.00 and $2,047.00. These funds are not used or intended to be used to purchase food.

*The State Administrative Funds for the Summer Food Service Program.* These are administrative funds paid to employ State personnel, including travel and related expenses, and to supervise and give technical assistance to sponsors in their initiation, expansion, and conduct of any food service for which program funds are made available. State agencies may also use administrative funds for such other administrative expenses as are set forth in their approved Program management and administration plan. The amount currently frozen for this program is $77,949.30. These funds are not used or intended to be used to purchase food.

*Child and Adult Care Food Program "Cash in Lieu" Payments.* The

only grant funding which can be used for purposes of purchasing food is the Child and

Adult Care Food Program "Cash in Lieu" Program. For each school year, the State of

Maine may, upon application to Food, Nutrition, and Consumer Services prior to the

beginning of the school year, elect to receive cash in lieu of donated foods for use in

nonresidential childcare or adult care institutions participating in the Child and Adult

Care Food Program. It must then promptly and equitably disburse any cash received in

lieu of donated foods to eligible program schools, service institutions, and

nonresidential childcare institutions, as applicable. The funds are only to be used to

purchase United States agricultural commodities and other foods for use in their food

service under the National School Lunch Program, Child and Adult Care Food Program,

or Summer Food Service Program, as applicable. For the "Cash in Lieu" program,

$49,188.60 remains frozen and $24,200.00 exists in Fiscal Year 2024 Q3 funds which

are not to be distributed. By comparison, in Fiscal Year 2024, the Food, Nutrition, and

Consumer Services distributed to the State of Maine $40,294,374.00 in total USDA

funds allotted for food, labor, and other indirect expenses; the State thereafter only used

$35,734,264.59 of those funds.

      **3.    The Federal Government Communicated with the State Extensively Prior to Instituting the Funding Suspension**

Beyond the immediate action challenged here, the State also includes in its

Motion discussion of communications and actions undertaken by other federal agencies.

None of those actions or communications are challenged here, and none are relevant to

the resolution of the emergency Motion. *See* Verified Am. Compl. ¶¶ 46-67.

### III.  Argument

Injunctive relief is an extraordinary and drastic remedy that is never awarded as of right. *See Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). In order to grant a temporary restraining order to the State,[3] the Court "must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (injunctive relief is "an extraordinary remedy never awarded as of right"). Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)).

#### 1.      The State will not Suffer Irreparable Harm

Even where a likelihood of success on the merits is shown, a party may not "rest on the laurels of its case. . . to excuse whatever shortcomings might exist in the harm that it alleges." *Braintree Labs., Inc. v. Citigroup Glob. Mkts Inc.*, 622 F.3d 36, 43 (1st Cir. 2010). "[A]t least some positive showing of irreparable harm must still be made." *Id.*; *see Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1232 (1st Cir. 1993) (courts "cannot dispense with the irreparable harm requirement in affording injunctive relief"). "[P]roof of a mere possibility of injury is insufficient to justify an injunction; the party

---

[3]      Courts apply this four-factor analysis to preliminary injunction motions and temporary restraining order motions alike. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993)).

'seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

The State has failed to establish that the freeze at issue "will prevent children from being fed," *see* Verified Am. Compl. p. 14, because no such thing will occur. As detailed above, *see supra* Section II.2, the only grant funding which can be used for purposes of purchasing food is the Child and Adult Care Food Program "Cash in Lieu" program, for which only $49,188.60 remains frozen and $24,200.00 exists in Fiscal Year 2024 Q3 funds which are not to be distributed. Corley Decl. ¶ 10. None of the other programs at issue are used to purchase food for children. *Id.* ¶ 3. Instead, the suspended funds concern administrative, technological, equipment, and personnel-related funding streams. *See id.* ¶¶ 4-9. The State, moreover, provides few specific details about how those funds are used or whether alternative funding sources are available, averring only generally that "providers will have to cease operations" and "employees will be laid off." Dkt. #3-1 at 4, ¶ 14.

The State's fiscal claims of net irreparable harm also warrant a closer look. As with prior fiscal years, the State ended 2024 with a surplus, reportedly tallying $93.5 million. *See* ME. DEP'T OF ADMINISTRATIVE AND FINANCIAL SERVICES, "State of Maine ends Fiscal Year 2024 with Surplus," Aug. 2, 2024, https://www.maine.gov/dafs/news/state-maine-ends-fiscal-year-2024-surplus.[4] The majority of these funds go to the State's

---

[4]    In Governor Janet Mills' "State of the Budget Address" this past January, it was noted that, "over the past three years, we have ended <u>every</u> Fiscal Year in the black." *See* https://www.maine.gov/governor/mills/sites/maine.gov.governor.mills/files/inline-files/Governor%20Mills%202025%20State%20of%20the%20Budget%20Remarks%20As%20Prepared%20for%20Delivery%20.pdf (emphasis original).

Budget Stabilization Fund. *Id.* "The 2024 fiscal year-end balance of the Budget Stabilization Fund," more importantly, was "$968.3 million." *Id.*; *see also* ME. DEP'T OF ADMINISTRATIVE AND FINANCIAL SERVICES, "Maine Budget Stabilization Fund," https://www.maine.gov/osc/financial-reporting/maine-budget-stabilization-fund.

Accordingly, the State's assertion that it "does not have state funds available to replace the funds that have been frozen" (Dkt. #3-1 at 5, ¶ 20) is belied by the public record. The total suspended funds at issue are a fraction of the State's budget surplus for fiscal year 2024 alone, to say nothing of the State's nearly $1 billion "rainy day fund." The requisite irreparable harm is therefore lacking. *Contra* Mot. at 15-16.

2.    **The State is Unlikely to Succeed on the Merits**

The State also failed to carry its burden of showing a likelihood of success on the merits—in particular, the State has failed to clearly establish that this Court has jurisdiction over the claims at issue. As this Court noted in its recent Order to Respond, in a recent case involving similar challenges to Education's alleged termination of certain grants, *Department of Education v. California*, No. 24A910, 2025 WL 1008354 (Apr. 4, 2025) (per curiam), the Supreme Court granted the Government's application for a stay of a temporary restraining order pending appeal. It did so because the Tucker Act required the challenges to proceed before the Court of Federal Claims, and not in a federal district court. *Id.* at *1. Insofar as the State here is also effectively trying to enforce its rights in certain grants that employ contracts to set the terms and commitments of recipients, then this Court would lack jurisdiction for the same reason as in *Department of Education v. California*.

It is well-established that the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't*

10

*Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks access to funding that it believes the Government is obligated to pay under a contract or grant, the proper remedy is typically a Tucker Act suit, rather than an APA action. *See California*, 2025 WL 1008354 at *1; Order to Respond ¶ 2. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). And the Tucker Act's preclusive effect extends to some claims founded on grants. To the extent that the Government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," then the proper recourse for asserted violations of those grant terms is likely a "suit in the Claims Court for damages relating to an alleged breach." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

As to determining whether the State's "particular action" is "at its essence a

contract action" subject to the Tucker Act or instead a challenge properly brought before this Court, "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)" must be examined. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g., Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (evaluating whether "the essence of the action is in contract").

Applying those principles here, to the extent the State is effectively trying to enforce its rights in certain grants that employ contracts to set the terms and commitments of recipients, then this action would sound in contract and this Court would lack jurisdiction for the same reasons as *Department of Education v. California*. Insofar as there is uncertainty over the nature of the State's claims, that only weighs further against granting the State's motion. Ultimately, it is the State's burden to establish both this Court's jurisdiction and its entitlement to immediate injunctive relief. Any lingering concerns over this Court's jurisdiction are additional reasons to deny the extraordinary remedy the State requests in this emergency posture. *Cf. California*, 2025 WL 1008354, at* 1 (granting stay upon showing that the "Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA").[5]

---

[5]     The Supreme Court's holding in *Department of Education v. California* may exhibit some characteristics distinguishable from this case (Order to Respond ¶ 3). Unlike in *Department of Education v. California*, the State's allegations rely on certain federal statutes applicable to USDA, in addition to the APA itself. Nevertheless, until the State definitively establishes this Court's jurisdiction over the matter, it cannot succeed on the merits.

### 3.      The Public Interest and a Balancing of the Equities do not Warrant a Temporary Restraining Order

The State is mistaken that Defendants will experience no harm "on the other side of the ledger" if a temporary restraining order is granted. Mot. at 17.[6] In *Department of Education v. California*, the Supreme Court concluded that the temporary restraining order factors militated in favor of Education, because the federal government will be harmed if it is unable to "recover the grant funds once they are disbursed" while, conversely, grant recipients "can recover any wrongfully withheld funds through suit in an appropriate forum." *Id.* The same is true here: USDA will likely be unable to recover any grant funds once they are disbursed. Relatedly, despite the present suspension of the USDA funding at issue, the State by all appearances maintains the fiscal wherewithal to fund its own school nutrition programs.

### IV.  Conclusion

Because the State has failed to meet its burden pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705, no temporary restraining order should enter. Defendants accordingly request that the Court deny the State's Motion, and grant all other relief as may be just and proper.

If it is determined that the State has met its burden and the Court issues the temporary restraining order, Defendants request that security be given by the State.[7]

---

[6]      The Government addresses both the balancing of the equities and public interest factors under a single heading here, as did the State. Mot. at 17.

[7]      Pursuant to the recent Executive Order entitled, *Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)*, it is the policy of the Executive Branch "to demand that parties seeking injunctions against the Federal Government must cover the costs and damages incurred if the Government is ultimately found to have been wrongfully enjoined or restrained." *See* https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/.

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The State, as established above, is a well-resourced sovereign. The Court's potential reinstatement of the suspended funding may impose significant monetary losses during this litigation on the USDA. The Court should thus require the State to provide security in an amount commensurate with these costs.

Dated: April 9, 2025          Respectfully submitted,
       Bangor, Maine

CRAIG M. WOLFF
Acting United States Attorney

/s/ ANDREW K. LIZOTTE
Andrew K. Lizotte
Civil Chief
United States Attorney's Office
202 Harlow Street
Bangor, Maine 04401
(207) 262-4636
Andrew.Lizotte@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2025, I caused the foregoing to be electronically filed with Clerk of Court using the CM/ECF system, which sent such notice to any individuals and entities who have entered appearances in this case to date, pursuant to the Court's ECF system.

CRAIG M. WOLFF
Acting United States Attorney

 /s/ ANDREW K. LIZOTTE
Andrew K. Lizotte
Civil Chief
United States Attorney's Office
202 Harlow Street
Bangor, Maine 04401
(207) 262-4636
Andrew.Lizotte@usdoj.gov