UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE, )<br>　　　　Plaintiff, )<br>)<br>　　v. )　　Civil Action No. 1:25-cv-00131-JAW<br>)<br>UNITED STATES DEPARTMENT )<br>OF AGRICULTURE and BROOKE )<br>ROLLINS, in Her Official Capacity as )<br>Secretary of Agriculture, )<br>)<br>　　　　Defendants. ) | |

**STATE OF MAINE'S REPLY IN SUPPORT OF MOTION FOR
EMERGENCY TEMPORARY RESTRAINING ORDER**

Defendants make no effort whatsoever to dispute that they unlawfully froze federal funds because of the State of Maine's alleged violation of Title IX. Defendants instead attempt to deflect by suggesting that the Court <u>might</u> not have jurisdiction over this matter, and, even if it does, there is no remedy for Defendants' illegal action because the State failed to demonstrate irreparable harm. Defendants apparently acknowledge acting unlawfully but argue that there is nothing the Court can do about it.

*The State of Maine Will Suffer Irreparable Harm.*

Defendants argue that there is no irreparable harm because the funding freeze will not prevent children from being fed. Opp. Br., at 9. This is so, they claim, because, for the most part, funds used to buy food are still accessible. *Id.*[1] But as the State demonstrated in its motion, with no funds for state level operating costs (referred to by Defendants as state administrative funds) Maine's Child Nutrition Program ("CNP") cannot administer the food programs and children will

---

[1] Defendants concede that "Cash in Lieu" funds, which <u>are</u> used to purchase food, have been frozen. Opp. Br., at 6-7. They compare the amount of frozen funds to the total amount the Food, Nutrition, and Consumer Services distributed to, and used by, the State, *id.*, but it is difficult to see what relevance that comparison has.

go hungry. McLucas Decl., ¶ 17. Nor do Defendants contest that the freezing of CACFP administrative funds prevents providers from paying the individuals who run the programs that prepare and provide the food to children and adults. McLucas Decl., ¶ 14.

Defendants' only response is to speculate that the State can replace the frozen funds with its own money. As an initial matter, the unrebutted evidence in the record is that "[t]he State of Maine does not have state funds available to replace the funds that have been frozen." McLucas Decl., ¶ 20.[2] And more fundamentally, Defendants ignore the legal limitations on use of State money. Under Maine's Constitution, "[n]o money shall be drawn from the treasury, except in consequence of appropriations or allocations authorized by law." Maine Const., Art. V, pt. 3rd, § 4. So CNP cannot simply take money from the Budget Stabilization Fund (or any other fund) without legislative authority. Because USDA agreed to fund CNP, the Legislature has not allocated state funds for that purpose. And even if the Legislature was able to act now and appropriate state funds, unless it did so with a 2/3 majority, legislative actions do not become effective until ninety days after adjournment. Maine Const., Art. IV, pt. 3rd, § 16.[3]

As another federal court recently stated in analogous circumstances:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because those served by the expected but frozen funds have no idea when the promised monies will flow again.

---

[2] This fact distinguishes this case from *Department of Education v. California*, No. 24A910, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025), where states "represented . . . that they have the financial wherewithal to keep their programs running."

[3] That the State cannot simply make up the loss of federal funds with its own money is illustrated by the recent layoff of thirteen employees of the Maine State Library after federal grants used to fund those positions were frozen. https://www.pressherald.com/2025/04/09/state-library-lays-of-13-workers-will-restructure-after-losing-federal-funds.

*New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025). "This is particularly true where the States had no notice of a potential freeze so they could plan." *Id*.[4]

Moreover, the irreparable harm here is more than just pecuniary. Defendants do not dispute that they acted unlawfully. Beyond harming the State and its residents, unlawful conduct by federal agencies "harm[s] . . . our orderly system of government." *Id*. When Congress has enacted "statutes and appropriated these funds for legitimate reasons," a federal agency's "categorical freeze, untethered to any statute, regulation, or grant term, frustrates those reasons, and causes significant and irreparable harms to the States. *Id*., at *15.[5]

### The State is likely to prevail on the merits.

Defendants argue that Maine is unlikely to succeed on the merits because it has "failed to clearly establish that this Court has jurisdiction over the claims at issue." Opp. Br., at 10. In support, they rely on *Department of Education v. California*, No. 24A910, 2025 WL 1008354, *1 (U.S. Apr. 4, 2025), where, in a divided per curiam decision, the Supreme Court, in granting a stay pending appeal, concluded that because the claims brought by various states were based on an "express or implied contract with the United States," the APA's waiver of sovereign immunity did not apply and instead the Court of Federal Claims had jurisdiction over the claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). But Defendants themselves concede that case "may exhibit some characteristics distinguishable from this case" and that unlike in that case, "the State's allegations rely on certain characteristics applicable to USDA, in addition to the APA itself." Opp.

---

[4] In a heading, Defendants state: "The federal government communicated with the State extensively prior to instituting the funding suspension." Opp. Br., at 7. If this statement is intended to suggest that the State was on notice of an impending freeze of USDA funds, it is demonstrably false. The prior communications were with other federal agencies and had <u>nothing</u> to do with USDA or school nutrition programs.

[5] "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (cleaned up).

3

Br., at 12 n.5. They further hedge when they say that *Department of Education. v. California* would apply "to the extent the State is effectively trying to enforce its rights in certain grants that employ contracts to set the terms and commitments of recipients." Op. Br., at 12. But the State is not to <u>any extent</u> attempting to enforce the terms of the frozen grants.

As Defendants implicitly recognize, *Department of Education v. California* and the Tucker Act have nothing to do with this case. That case arose out of a lawsuit filed by several states arguing that the United States Department of Education ("USDOE") arbitrarily terminated certain grants supporting teacher development. *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025). As relevant here, the Supreme Court concluded that USDOE was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ. v. California*, 2025 WL 1008354, at *1. The Court noted that "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," or to actions seeking "'money damages.'" *Id*. (quoting 5 U.S.C. § 702). The Court concluded that the APA's waiver of immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id*. (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, the Court stated, the Tucker Act confers jurisdiction on the Court of Federal Claims for "suits based on 'any express or implied contract with the United States.'" *Id*. (quoting 28 U.S.C. § 1491(a)(1)).

For several reasons, the Court's decision in *Department of Education v. California* is not applicable here. As the State pointed out in its motion (at 12), Congress expressly declared that in the absence of any other means of judicial review, any "person aggrieved"[6] by agency action

---

[6] Congress expressly stated that a "person aggrieved" includes states and their political subdivisions and agencies. 20 U.S.C. § 1683.

terminating, or refusing to grant or continue, federal financial assistance as a result of a Title IX violation "may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title." 20 U.S.C. § 1683.  Congress could not have been more clear in declaring that an action terminating federal financial assistance for a violation of Title IX is reviewable under the APA.  Defendants do not mention Section 1683, much less try to explain why this statute does not control here.

Moreover, and as Defendants acknowledge, the Tucker Act would apply only to the extent that the State is seeking to enforce contractual rights.  Opp. Br., at 10.  But the State is <u>not</u> seeking to enforce such rights.  Rather, it is seeking judicial review of a federal agency's Title IX enforcement action.  Congress expressly provided agencies with the authority to terminate or discontinue financial assistance as a means of enforcing compliance with Title IX.  20 U.S.C. § 1682 ("Compliance with any requirement adopted pursuant to this section may be effected . . . by the termination of or refusal to grant or to continue [financial] assistance. . . .").  And Congress then provided for judicial review of such an enforcement action.  20 U.S.C. § 1683.  The fact that here the federal government's enforcement action is the termination of grants does not somehow turn this into a breach of contract case. The State is seeking to enforce statutory and regulatory rights that are distinct from any contractual or other obligation arising from the terms or conditions of any individual grant that Defendants have frozen.

What also separates this case from *Department of Education v. California* is that here, Congress has set forth specific limits on an agency's ability to terminate financial assistance based on a recipient's alleged violation of Title IX.  Among other things, there must be a finding on the

5

record, after opportunity for a hearing, of the recipient's violation.[7]  Defendants do not dispute that they did not follow that process here.  This challenge does not turn on whether Defendants complied with the grant terms.  It turns on whether Defendants failed to follow the legally required process for enforcing Title IX.  And Defendants do not dispute that they failed in that regard.

But even assuming for argument's sake that this case did implicate the terms of the grants, the Tucker Act would not apply.  Section 702 carves out claims for "money damages."  5 U.S.C. § 702.  As the Supreme Court has recognized, "the exception for an action seeking 'money damages' should not be broadened beyond the meaning of its plain language."  *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988).  So while the exception might apply to "a suit seeking money in <u>compensation</u> for the damage sustained by the failure of the Federal Government to pay as mandated," it does not apply to "a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money."  *Id.* (emphasis in original).  Here, the State is not seeking compensation for the damage caused when Defendants shut off funds used to feed hungry children and vulnerable adults.  Rather, the State is seeking to enforce the "statutory mandate itself," which prohibits Defendants from discontinuing financial assistance for violations of Title IX unless and until they comply with the applicable statutory and regulatory requirements.  Put another way, the State is seeking a specific equitable, prospective remedy—setting aside Defendants' action freezing congressionally appropriated funds.  It does not matter that this equitable relief may later result in the payment of money: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as

---

[7] Defendants seem to suggest that there is no need for hearing or written findings because the State has "full awareness of the payment termination."  Opp. Br., at 2.  The purpose of the hearing, though, is to determine whether, as Secretary Rollins claims, Title IX prohibits allowing transgender girls and women to play on girls' and women's teams, and the written findings are needed so the State can obtain judicial review, if necessary.  Defendants repeatedly gloss over the fact that they have never presented any support for their interpretation of Title IX, and they seem determined to avoid judicial consideration of the issue.

'money damages." *Id.*, at 893. Indeed, *Bowen* recognized that one specific type of review that Congress authorized through the sovereign immunity waiver in Section 702 was to allow for judicial review of issues arising from the "administration of Federal grant-in-aid programs." *Id.,* at 898.[8]

As the Supreme Court recently reaffirmed, "Congress . . . enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (cleaned up). The APA check is needed here, and there is no question that the Court has jurisdiction to review Defendants' unlawful actions.

### *The Remaining Factors Warrant Injunctive Relief.*

Defendants argue that they will be harmed because they will not be able to recover funds once they are disbursed. But "[a]n agency is not harmed by an order prohibiting it from violating the law." *New York v. Trump*, 2025 WL 715621, at *13. Moreover, Defendants' argument is premised on the notion that they might prevail on the merits. But given that they do not dispute that the freezing of federal funds was unlawful, it is impossible to see how that could happen. Finally, in light of Defendants' argument that the funds at issue are a small amount given Maine's annual budget, it lacks credibility for Defendants to then suggest that given the overall size of the federal budget, the amount at issue would harm the federal government if it could not be recovered.

---

[8] Conversely, for the Court of Federal Claims to have jurisdiction, the plaintiff must present a claim for "actual, presently due money damages from the United States." *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King,* 395 U.S. 1, 3 (1969). The State does not presesnt such a claim here.

Dated: April 10, 2025                     Respectfully submitted,

                                          AARON M. FREY
                                          Attorney General

                                          /s/ Christopher C. Taub
                                          CHRISTOPHER C. TAUB
                                          Chief Deputy Attorney General
                                          Christopher.C.Taub@maine.gov
                                          SARAH A. FORSTER
                                          Assistant Attorney General
                                          Sarah.Forster@maine.gov
                                          Office of the Attorney General
                                          State House Station 6
                                          Augusta, ME 04333
                                          Telephone: (207) 626-8800

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2025, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants as identified in the CM/ECF electronic filing system for this matter.

Dated:  April 10, 2025                    /s/ Christopher C. Taub
                                          CHRISTOPHER C. TAUB
                                          Chief Deputy Attorney General
                                          Office of the Attorney General
                                          6 State House Station
                                          Augusta ME  04333-0006
                                          Tel.  (207) 626-8800
                                          Fax (207) 287-3145
                                          Christopher.C.Taub@maine.gov